[No. F008112. Fifth Dist. Feb. 17, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES DEAN DICKENS, Defendant and Appellant.

**COUNSEL**

Jaime A. Alcabes, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Joel Carey and Derald E. Granberg, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BEST, J.**—Defendant was convicted by jury of lewd and lascivious conduct with a child under the age of 14. (Pen. Code,[1] § 288, subd. (a).) The jury also found true an allegation that defendant occupied a position of special trust and committed an act of substantial sexual conduct. (§ 1203.066,

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

subd. (a)(9).) Probation was denied as mandated by section 1203.066 and defendant was sentenced to state prison for the lower term of three years. The sole contention on appeal is that the evidence was insufficient to support the jury's finding that defendant occupied a position of special trust within the meaning of section 1203.066, subdivision (a)(9). We affirm.

## FACTUAL SUMMARY

Janessa R. was seven years of age when she arrived on Friday, March 28, 1986, to spend Easter weekend with her father, John R., and his wife, Rozemma. Rozemma had arranged for her stepsister, Melanie M., to babysit Janessa on the night of Saturday, March 29, at the home Melanie shared with defendant. Melanie and her 13-month-old daughter, Christa, had lived with defendant, James Dean Dickens, at his house in Oildale since July 1985. Defendant, Melanie and Christa made up one household unit. Defendant was not the father of Christa, but Melanie considered him a good father figure for her child.

John and Rozemma took Janessa to Melanie and defendant's house about 7:30 or 8 p.m. on Saturday, March 29. John and Rozemma considered defendant, as well as Melanie, responsible for Janessa's care. This was "cause they live at the same house. They live together. I [Rozemma] see them as one." John "felt that he [defendant]—that he was responsible as well as Melanie since, previously stated, he took them to the park together, he played with her, you know, and he watched her at times."

When John and Rozemma arrived with Janessa, defendant and Melanie had visitors, Melanie's brother Mike and her friend Kathy Bigard. Later, Melanie's brother Floyd arrived. During the evening, defendant did some drinking and had a couple of "hits" of marijuana.

During the evening, Janessa and defendant were playing in the living room, poking each other. Janessa stopped playing "[b]ecause [defendant] poked me really hard in my peepee and I fell down." Janessa sat in a chair, ignored defendant and watched television. Defendant went back outside where they had a pipe which they were passing around.

About 10 p.m., Janessa went to bed in Christa's room. She slept on a mat on the floor and had a blanket. Christa was in a crib and was sleeping.

During the night and early morning, defendant came into Janessa's room on five separate occasions. The first two times defendant pinched Janessa's bottom. On the next three occasions, defendant touched Janessa on her "peepee"; his hand was inside her clothing and his finger was inside her. She

was able to identify defendant because he had red hair. Floyd had brown, curly hair, and Mike had black, straight hair. Janessa was scared except on the first occasion. Asked why she did not tell anyone at the house what defendant had done to her, Janessa explained she wanted to tell her stepmother or her dad.

About 10 a.m. the following day, Easter Sunday, Melanie took Janessa and Christa to a park where an Easter celebration with the family was being held. Janessa told no one during the celebration what defendant had done to her because she did not want anyone to get into a fight. During the day, Janessa's father noticed that she was "awful possessive" and observed that he "had to chase her off a couple times 'cause she was just hanging on me constantly all day." Rozemma noticed that Janessa immediately left the swings when Melanie and defendant went over to them. Janessa tried to stay as close to her and John as she could.

When it came time to leave the park and as soon as Janessa and Rozemma got into the car and shut the door, Janessa started to cry. Janessa then told Rozemma about defendant touching her. When John, who had driven separately to the park, got home, Rozemma told him she had bad news, that defendant had touched Janessa.

On April 7, 1986, Janessa was examined by Dr. Jess Diamond, Chairman of the Department of Pediatrics at Kern Medical Center. Dr. Diamond determined that Janessa was a "Tanner One" which means that, on a system of evaluation of sexual maturity, she has no sexual maturity. Based on the history which he received from the victim and the physical finding of a small partial tear of the hymen, Dr. Diamond's finding was one of sexual molestation. Dr. Diamond concluded that the injury could have been caused by a finger, penis or foreign object and had occurred at least seven and one-half days before his examination.

Defendant admitted entering the girl's bedroom on four occasions between 1 a.m. and 3 a.m. He went in to check the baby, Christa. He denied touching Janessa and denied molesting her.

### DISCUSSION

■ On appeal, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Substantial

evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (*In re James D.* (1981) 116 Cal.App.3d 810, 813 [172 Cal.Rptr. 321].)

Section 1203.066, subdivision (a)(9), provides: "(a) Notwithstanding Section 1203, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for, any of the following persons: [¶] (9) A person who occupies a position of special trust and commits an act of substantial sexual conduct. 'Position of special trust' means that position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the victim. Position of authority includes, but is not limited to, the position occupied by a natural parent, adoptive parent, stepparent, foster parent, relative, household member, adult youth leader, recreational director who is an adult, adult athletic manager, adult coach, teacher, counselor, religious leader, doctor or employer."

Section 1203.066, subdivision (a)(9), specifically states that the relationships which may fall within its definition of a position of special trust are not limited to those listed. "The language of subdivision (a)(9) singles out certain positions of authority in which it is presumed that submission to authority is commonplace, resulting in a potential for undue influence over the victim. Other trust relationships may be proved." (*People* v. *Lucero* (1984) 154 Cal.App.3d 245, 250 [201 Cal.Rptr. 99].)

Here, the jury was presented with substantial evidence from which it could conclude that the defendant occupied a position of special trust. The defendant, Melanie, and her daughter, Christa, made up a cohesive family unit; they had lived together in defendant's house for nine months. Melanie had baby-sat the victim on numerous occasions previously at defendant's home, but the child had never before stayed overnight. Melanie had taken care of Janessa five days per month after school for four months. The defendant himself had watched the victim on previous occasions, had played with her and had taken her to the park. The victim's father, John R., and his wife both considered that defendant, as well as Melanie, was responsible for Janessa's welfare.

Furthermore, the defendant, although not a blood relative, was part of the victim's extended family. Melanie was the stepsister of the victim's stepmother, Rozemma, Mr. R.'s wife of five years. On the day after the incident, the defendant, Melanie, the victim, her father and his wife all attended a family Easter picnic together.

■ There was substantial evidence from which the jury could conclude that defendant was a person in a position of authority such that he was able to exercise undue influence over the victim.

The judgment is affirmed.

Martin, Acting P. J., and Pettitt, J.,* concurred.

* Retired judge of the superior court sitting under assigment by the Chairperson of the Judicial Council.